# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

---

AMIN B. BOOKER, et al.,

                                Plaintiff,

      vs.                                  9:13-CV-1342
                                          (GTS/ATB)

HAROLD GRAHAM, et al.,

                                Defendants.

---

AMIN B. BOOKER, Plaintiff pro se
PAUL COLON, Plaintiff pro se
ADRIENNE J. KERWIN, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In their amended civil rights complaint, plaintiffs Booker and Colon[1], both practicing members of the Nation of Islam ("NOI") and inmates at Auburn Correctional Facility ("Auburn") at the time relevant to this action, allege that defendants violated their First Amendment right to practice their religion and their rights under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. § 2000cc-1(a) by interfering with their observance of the holy month of Ramadan during a facility-wide lockdown from July 29, 2013 through August 4, 2013. (Dkt. No. 178, Am. Compl.). Plaintiff Booker also alleges a separate violation of his rights under the First Amendment and RLUIPA

---

[1] A third plaintiff, Lawrence Wilson, voluntarily withdrew from this action with prejudice while the summary judgment motion was pending. (Dkt. Nos. 213, 214).

that occurred when he was denied access to weekly congregate religious services while administratively segregated in the Auburn Special Housing Unit ("SHU") for approximately thirty days in August and September 2013. (Am. Compl. at 14-15[2]). Plaintiff Booker further alleges that the charges which prompted his SHU confinement were made in retaliation for his grievance of the Ramadan lockdown. (Am. Compl. at 13). Plaintiffs seek injunctive and monetary relief. (Am. Compl. at 25-26).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 201). Only plaintiff Booker has responded in opposition to the motion. (Dkt. No. 216). Plaintiff Booker also filed a separate motion for sanctions in which he alleged that defendants' summary judgment motion was frivolous. (Dkt. No. 215). Defendants responded in opposition to the sanctions motion and in further support of their motion for summary judgment. (Dkt. No. 217). Defendants also requested that they be permitted to submit certain confidential exhibits under seal for *in camera* review, if necessary to the determination of the summary judgment motion. (Dkt. No. 218). Plaintiff Booker opposed the request for *in camera* review and restated his arguments in favor of sanctions. (Dkt. No. 219, 220).

For the following reasons, this court recommends that defendants' motion for summary judgment be granted as to all of plaintiffs' First Amendment and RLUIPA claims. This court further recommends that defendants' motion for summary judgment be denied as to plaintiff Booker's retaliation claim. Because this court has found that

---

[2] All page references are to the pagination in the CM/ECF system unless otherwise indicated.

defendants' summary judgment motion was appropriate, it further recommends that plaintiff Booker's motion for sanctions be denied. Finally, this court denies defendants' request for *in camera* review of additional confidential documents in support of their motion.

## DISCUSSION

I. **Facts and Contentions**

A. **Ramadan Lockdown**

In 2013, the Muslim holy month of Ramadan took place from July 8 to August 7. (Dkt. No. 201-17, ¶ 1). During this period, plaintiffs, as members of the NOI, had certain spiritual obligations: (1) to fast from sun up to sundown; (2) to congregate at sundown with other members of the community for prayer and a communal Halal[3] meal; (3) to consume the contents of a Sahoor bag[4] before sunrise; and (4) to engage in ritualistic washing prior to prayer. (Dkt. No. 201-2, Booker Dep. at 10-19).

From July 8, 2013 through the evening of July 28, 2013, the Muslim inmates at Auburn were provided hot halal meals to break their fast, Sahoor bags to eat prior to sun up, an opportunity to shower, and permission to congregate in a designated room. (Dkt. No. 201-17, ¶ 3). On July 29, 2013, Auburn Superintendent Harold Graham, a named defendant, instituted a lockdown order so that security staff could conduct a facility-wide frisk for contraband. (Graham Decl. ¶¶ 13, 22-23). The lockdown order

---

[3] At his deposition, plaintiff Booker explained that Halal food has been blessed and prepared in accordance with Islamic law. (Dkt. No. 201-2, Booker Dep. at 12).

[4] Plaintiff Booker testified that the Sahoor bag typically contained breakfast items such as boiled eggs, cereal, fruit, juice, and milk. (Booker Dep. at 17-18).

was issued with the permission of New York State Department of Corrections and Community Supervision ("DOCCS") Deputy Superintendent Joseph Bellnier. (Graham Decl. ¶ 20). The lockdown lasted from approximately 2 p.m. on July 29, 2013 until 1:45 p.m. on August 3, 2013. (*Id*. ¶ 22).

During the lockdown, most inmate movement within the facility ceased. (*Id*. ¶ 7). No inmate programs were run for the general population, no religious ceremonies or congregate prayer services were held, and inmates remained confined to their cells for all meals. (*Id*. ¶ 8). There were certain exceptions: movement to a "clean cell" for urinalysis testing; escorts to the infirmary for insulin injections; and previously scheduled family visits. (*Id*. ¶¶ 9-12). The facility also accommodated the needs of approximately fifty Auburn inmates who were receiving mental health treatment in an Intermediate Care Program ("ICP") unit that was separate from the general population. (Dkt. No. 217-1, Graham Reply Decl. ¶¶ 5-10). The ICP unit was searched at the beginning of the lockdown, so that those inmates could resume their mental health programs with minimal interruption. (Graham Reply Decl. ¶ 11).

Because of the lockdown, plaintiffs were not permitted to meet for communal meals or prayer with fellow NOI inmates. (Graham Decl. ¶ 24). They were also not provided the customary hot halal meal to break their fast at sundown. (*Id*. ¶ 24). Instead, Auburn provided the same bagged meal three times a day to all inmates, regardless of religious affiliation. (Dkt. No. 201-12, Martin Decl. ¶ 7). These meals, which had been approved by the DOCCS Office of Nutritional Services, contained non-pork meat, cheese, condiments, fruit or a cookie, bread, and juice. (Martin Decl. ¶ 8).

4

Sahoor bags were provided on the first day of the lockdown, but after that, plaintiffs were expected to use one of the bagged meals as a substitute. (Dkt. No. 201-17, ¶¶ 7, 66). Due to the movement restrictions, no inmates were allowed to use the showers. (Dkt. No. 201-17, ¶ 27). Standard lockdown policy called for hot water to be distributed to inmates to wash in their cells once the frisk of their cell block was completed, but plaintiff Booker denies that any hot water was ever delivered to his cell. (Dkt. No. 201-17, ¶ 27; Dkt. No. 216-2, ¶ 27). When the lockdown was fully concluded on August 3, plaintiffs were able to resume their traditional observance of Ramadan for the remainder of the holy month. (Graham Decl. ¶ 26).

B.     **Booker Confinement in SHU**

On August 13, 2013, defendant Fagan issued a recommendation that plaintiff Booker be confined to administrative segregation in SHU because his "presence in general population would have a detrimental effect to the safety and security of this facility." (Dkt. No. 216-4, at 80). This recommendation was based on defendant Fagan's conclusion, drawn largely from confidential material, that plaintiff Booker was involved in the production and distribution of a flyer that encouraged an inmate strike and the potential use of violence in response to alleged inhumane treatment at prisons nationwide, including the Ramadan lockdown at Auburn. (Dkt. No. 201-9, Fagan Decl. ¶¶ 9, 12-13; Dkt. No. 216-4, at 105). After an administrative hearing, defendant Robinson, who served as hearing officer, agreed with the recommendation that plaintiff Booker be administratively segregated in SHU. (Dkt. No. 216-4, at 114-115). While confined in SHU, defendant Graham, in accordance with DOCCS policy, prohibited

plaintiff from attending weekly Jumah religious services. (Am. Compl. at 14, 25; Graham Decl. ¶¶ 35-36). Approximately thirty days after plaintiff Booker was assigned to administrative segregation, defendant Graham transferred him to another facility. (Booker Dep. at 75).

## II. <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there

is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## III. <u>Religion Claims</u>

### A. **Legal Standards**

#### 1. **First Amendment**

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin*, 467 F.3d at 274 n.4. In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the

person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014). In *Holland*, the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-21. The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra* at 274-75; *Ford*, *supra* at 592 (where the court assumed without deciding that the substantial burden test applies)). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly.[5] *Id.* This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid. *See also Williams v. Does*, 639 F. App'x 55, 56 (2d Cir. 2016) (discussing the unsettled status of the substantial burden test).

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact

---

[5] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland*, 758 F.3d at 221.

8

on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

### 2.    Religious Land Use and Institutionalized Persons Act

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -
>
> > (A) is in furtherance of a compelling governmental interest; and
> >
> > (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial.[6] *Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002) (citing 42 U.S.C. § 2000cc-2(b)). The burden then shifts to the government to show that the burden furthers a compelling governmental interest **and** that it is the ***least restrictive*** means of achieving that interest. *Id.* The act defines

---

[6] RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

"religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord*, 520 F. Supp. 2d 487, 498 (S.D.N.Y. 2007) (citing, *inter alia, Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck*, 379 F. Supp. 2d 550, 557 (S.D.N.Y. 2005)). Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004) (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non curat lex*'"). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis*, 352 F.3d 582, 593-94 (2d Cir. 2003) (discussing First Amendment protections).

**B.    Application - Ramadan Lockdown**

**1.    First Amendment**

For purposes of this motion only, defendants have not significantly disputed[7]

---

[7] Defendants did submit a declaration from Ali Muhsen, Chaplain for the Muslim faith at Auburn, who concluded that the five day lockdown imposed "minimal burdens on the Muslim community" that were outweighed by legitimate security needs. (Dkt. No. 201-13, Muhsen Decl., ¶ 23). Plaintiff Booker rejected this contention, and noted that Muhsen was a Sunni Muslim, who was not subject to the same religious dietary restrictions as an NOI member. (Dkt. No. 216, Booker Decl. ¶¶ 24-26).

plaintiffs' contention that the lockdown's interference with their observance of Ramadan substantially burdened their ability to practice their religion. (Dkt. No. 201-18, Def.'s Br. at 8). Rather, they argue that any burden was reasonably related to legitimate penological interests and in furtherance of the compelling governmental interest of prison security. They also argue that qualified immunity would prevent the assessment of damages against defendants Martin, Thomas, Robinson, Arria, Carpenter, Griffin and Stevens.[8]

### a.    Legitimate Penological Interest

Assuming that plaintiffs' sincerely held religious beliefs were substantially burdened, the court must consider whether defendants meet the "relatively limited burden" of identifying the legitimate penological interests that justified the lockdown and resulting interference with Ramadan. *Salahuddin*, 467 F.3d at 275 (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 127–28 (1977) (prison officials need only testify to the legitimate penological interests behind the challenged conduct to meet their burden of proof)). Once a legitimate penological interest is articulated, its

---

[8] Defendants Martin, Thomas, Robinson, Arria, Carpenter, Griffin, and Stevens argue that they are entitled to qualified immunity, because they had no input into the development or implementation of the lockdown order, and were following what they believed to be a lawful order. (Dkt. Nos. 201-12, Martin Decl. ¶¶ 12-13; Dkt No. 201-16, Thomas Decl. ¶ 14; Dkt. No. 41-6, Robinson Decl. ¶¶ 19, 31; Dkt. No. 201-7, Arria Decl., ¶¶ 11, 14; Dkt. No. 201-8, Carpenter Decl. ¶¶ 11, 13; Dkt. No. 201-11, Griffin Decl. ¶¶ 11, 13; and Dkt. No. 201-15, Stevens Decl. ¶¶ 11, 13 ). This court need not address this issue because I find that the lockdown did not violate plaintiffs' First Amendment rights, and the related RLUIPA claims are moot. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If the defendants have not violated the plaintiff's rights in the first instance, the court need not reach the issue of whether a reasonable person would have known of the violation.

reasonableness is then subject to the *Turner* analysis. *Sproul v. Goord*, No. 9:05-CV-75, 2007 WL 2609787, at \*11 (N.D.N.Y. Sept. 5, 2007).

Defendants justified the security need for the lockdown and facility-wide frisk, and its timing during the holy month of Ramadan, by citing the increase in security incidents at the facility in June and July 2013. (Dkt. No. 201-17, ¶ 17). Between June 22, 2013, and July 29, 2013, there were seven assaults on Auburn staff, eleven assaults on inmates, twenty-one fights between inmates, twelve weapons recovered, and twelve documented uses of force by Auburn staff. (Graham Decl. at ¶ 13). Defendants compared this to data which showed that there had been only one assault on staff, three assaults on inmates, two weapons recoveries, and two documented uses of force during the immediately previous twenty day period from June 1, 2013 through June 21, 2013. (*Id.*). Defendant Graham's request to DOCCS Deputy Commissioner Bellnier (who is not named as a defendant in this case) for permission to order a lockdown was approved on July 29, 2013, and the lockdown was implemented that afternoon. (Graham Decl. ¶¶ 20, 22).

In explaining his lockdown order, defendant Graham stated that "[t]he presence of contraband within a facility and its subsequent possession and/or use by inmates threatens the security of the facility, endangers the safety of inmates, employees, visitors, and the community, and impairs rehabilitation programs." (Graham Decl. ¶ 4). The discovery of "contraband and other potentially dangerous items" has been recognized as a "clearly legitimate objective" for prison officials. *Lewis v. Zon*, 920 F. Supp. 2d 379, 385 (W.D.N.Y. 2013).

This court agrees with defendants that the lockdown had a legitimate, rational connection to the governmental objective of reducing contraband and enhancing prison security. Defendant Graham explained in his declaration that "[t]he purpose of halting inmate movement is to ensure that the facility can be properly and thoroughly searched without the distraction of the normal operation of the facility, to eradicate the ability of inmates to move or eliminate contraband they have concealed in facility areas or living quarters, and also to make security staff available to conduct the facility wide frisk." (Graham Decl. ¶ 7).

Defendant Graham recognized that the lockdown would interfere with the observance of Ramadan, but believed that the intrusion was justified under the circumstances. (Graham Decl. ¶ 19). Fully accommodating the observance of Ramadan would have either required postponing the frisk despite the perceived need for an immediate response, or delaying completion of the frisk by diverting staff. Prison officials are entitled to "wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979). "In the absence of evidence showing that the officials have exaggerated their response to security matters, their expert judgment should be accepted by the courts." *Hurley v. Ward,* 549 F.Supp. 174, 184 (S.D.N.Y.1982) (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128 (1977); *Pell v. Procunier,* 417 U.S. 817, 827 (1974)).

Defendants provided plaintiffs with an alternative, albeit incomplete, means of

meeting some of their Ramadan obligations while confined to their cell. (Graham Decl. ¶¶ 17, 23). Plaintiffs were provided bagged meals to break their fast, and to use as a substitute for the traditional Sahoor bag. (Graham Decl. ¶ 25). Although there is some dispute as to whether hot water was provided to plaintiffs once the frisk of their cell block was complete, such accommodation was Auburn's standard policy. (Graham Decl. ¶ 27; Dkt. No. 216-2, ¶ 27).

Throughout this litigation, plaintiffs have questioned the need for a lockdown, and argued that even if the lockdown was necessary, Auburn had sufficient staffing to avoid interrupting the observance of Ramadan. (Booker Decl. ¶¶ 29-31, 41). In his response to this motion for summary judgment, plaintiff Booker further contends that defendant Graham misled DOCCS officials when he initially advised that he did not anticipate any interference with Ramadan during the lockdown. (Dkt. No. 216-1, at 4-5). Plaintiff Booker also argues that multiple defendants misled inmates about the length of time that the lockdown would interfere with the holy month. (Dkt. No. 216-1, at 4). This court has considered these arguments, but concludes that plaintiffs have failed to raise any material question of fact regarding the rationality of defendants' implementation of the lockdown, and have not proposed any viable alternatives that would not adversely impact staff, inmates, and prison resources.

Plaintiff Booker argues that, based on his experience at Auburn and other DOCCS facilities, he did not observe any significant inmate behavioral changes in June or July 2013 that would prompt a lockdown. (Booker Decl. ¶¶ 29-31). In particular, plaintiff Booker argues that the data relied upon by defendants Graham and Robinson

to document the rise in inmate violence prior to the lockdown could not be accurate because such an increase "would have been noticeable." (Booker Decl. ¶ 30). At their depositions, plaintiffs testified that they never received an adequate explanation for the lockdown from Auburn officials. (Booker Dep. at 54; Dkt. No. 201-3, Colon Dep. at 31). However, the fact that plaintiffs were unaware of any increase in violent incidents does not create an issue of fact regarding defendants' security concerns. *See DeJesus v. Bradt*, Case No. 6:13-CV-6066 EAW, 2016 WL 1266652, at *9-10 (W.D.N.Y. Mar. 31, 2016) (policy that banned the removal of food from the mess hall during Ramadan could not be deemed irrational merely because plaintiff was unaware of security problems caused by the practice); *Jermosen v. Coughlin*, Case No. 87 Civ. 6267 (RJW), 1993 WL 267357, at *4 (S.D.N.Y. July 9, 1993) (mere fact that plaintiff lacked personal knowledge of perceived security risk was not evidence of its nonexistence); *see also Seymour/Jones v. Vaughn*, Civ. A. No. 89-8087, 1991 WL 195737, at *1 (E.D. Pa 1991) ("In order for a decision to lock down a prison to be reasonable, the prison authority must believe that a valid prison purpose exists for the lock down, and not simply be acting out of spite or malice. It is not necessary for his information to, with the clarity of 20-20 hindsight, turn out to have been true.").

Plaintiffs further argue that, even if the lockdown was warranted, Auburn officials could easily have accommodated their observance of Ramadan. (Booker Decl. at ¶ 43). At his deposition, plaintiff Booker testified that approximately 65 to 75 NOI inmates were observing Ramadan at Auburn that year. (Booker Dep. at 14). He was unsure of the number of Sunni Muslims who were also observing the holy month, but

testified that the Sunni community was larger than the NOI community. (*Id.*).  Based on his experience as an inmate at Auburn and other DOCCS facilities, plaintiff Booker estimated that it would only require a total of eleven correctional officers to escort Muslim inmates to the showers, services, and cell blocks; supervise the NOI and Sunni Muslim inmates during their separate congregational services; and deliver halal meals and Sahoor bags to inmates observing the holy month.  (Booker Decl. ¶ 35).  He also argued that the kitchen staff could have prepared halal meals and Sahoor bags at the same time as the rest of the facility's bagged meals. (Booker Decl. ¶ 41).  In addition, plaintiff Booker alleges that the lockdown was conducted in an inefficient manner that unnecessarily extended the length of the contraband search and prolonged the burden on the observation of Ramadan.[9]  (Booker Decl. ¶ 66-67).

Plaintiffs' criticism of the lockdown and their suggested alternative are based solely on their own observation of prison operations while incarcerated at various DOCCS facilities. (Booker Decl. ¶¶ 39, 41; Colon Dep. at 25-28).  Their suggested approach, which would have allowed greater freedom of movement to the more than one hundred Auburn inmates observing Ramadan, would have increased inmate movement in the facility, negatively impacted security staff and kitchen employees, and likely prolonged the duration of the lockdown.  As explained by defendant Graham, the purpose of restricting inmate movement is to allow an efficient and thorough search

---

[9] Plaintiff Booker also speculated that prison staff intended to allow the observation of Ramadan during the lockdown, but so enjoyed the minimal workload during the facility wide contraband search that they made a collective decision to "drop Ramadan." (Booker Decl. ¶ 69).

"without the distraction of the normal operation of the facility." (Graham Decl. ¶ 7).

Plaintiffs' suggested diversion of security staff from the facility-wide frisk, and re-structuring of Auburn's existing lockdown protocols, would have more than a *de minimis* impact on prison operations. Because defendants have demonstrated a legitimate penological purpose for the burden imposed on plaintiff's First Amendment rights, this court recommends that defendants' motion for summary judgment be granted as to plaintiff's First Amendment claims.

## 2. RLUIPA

To the extent that plaintiffs assert RLUIPA claims for injunctive or declaratory relief against any of the defendants in either their individual or official capacities for their roles in the lockdown and the resulting interference with Ramadan, those claims should also be dismissed.[10] Although plaintiffs could ordinarily pursue claims for such relief under RLUIPA against defendants in their official capacities, neither plaintiff is currently incarcerated at Auburn. Plaintiff Booker is currently incarcerated at Elmira Correctional Facility, and plaintiff Colon is currently incarcerated at Fishkill Correctional Facility. (Dkt. Nos. 104, 105). Transfer to another facility moots claims for declaratory or injunctive relief against Auburn officials. *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) (citing *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006)); *see also Wright v. New York State DOCCS,* 568 F. App'x 53, 55 (2d Cir. 2014); *Wood v. Captain Colon*, No. 3:13-CV-1467, 2016 WL 2930882, at *3 (D. Conn. May

---

[10] Judge Suddaby dismissed plaintiffs' claims for monetary damages under RLUIPA with prejudice on March 31, 2014. (Dkt. No. 24, at 25).

18, 2016).

If plaintiffs had named an individual who had authority to change state-wide policy regarding lockdowns during religious holidays, it is possible that their RLUIPA claim would not be moot as to that individual in his or her official capacity. *See Smith v. Artus*, 522 F. App'x 82, 84 (2d Cir. 2013) (finding that plaintiff's transfer to a new facility did not render moot his claims for injunctive and declaratory relief under the First Amendment or RLUIPA when plaintiff was subjected to the same policy banning inmate demonstrative prayer in the recreation yard at his new facility, and there was a state-wide policy banning such conduct). None of the named defendants have such state-wide authority. Therefore, all of plaintiffs' remaining RLUIPA claims are moot as against the only defendants that they have named.

### C. Application - Booker SHU Confinement

#### 1. First Amendment & RLUIPA

Separate from the lockdown, plaintiff Booker claims that defendant Graham violated his rights under the First Amendment and RLUIPA by enforcing DOCCS policy that inmates housed in SHU may not attend congregate religious services. Plaintiff Booker was housed in administrative segregation in Auburn SHU for approximately thirty days before being transferred to another facility. (Booker Dep. at 75). This court recommends that defendant Graham be granted summary judgment as to these First Amendment and RLUIPA claims.

Prohibiting a particular inmate's attendance at congregate religious services because he is housed in administrative segregation does not violate the First

Amendment if the restriction serves a valid penological purpose. *Graham v. Coughlin*, No. 86 Civ. 163, 2000 WL 1473723, at *6 (S.D.N.Y. Sept. 29, 2000) (citing *Bellamy v. McMickens*, 692 F. Supp. 205, 214-15 (S.D.N.Y. 1988)). Similarly, denial of an inmate's request to participate in congregate religious services while housed in SHU does not violate RLUIPA when it furthers compelling government interests of promoting prison security, and the burden placed on the inmate is the least restrictive means of serving those interests. *Walker v. Artus*, 998 F. Supp.2d 18, 28-29 (N.D.N.Y. 2014) (denial of inmate's request to participate in Jumah services by audio or video feed while in SHU did not violate RLUIPA); *see also Smith v. Artus*, No. 9:07-CV-1150 (NAM/ATB), 2010 WL 3910086, at *30, vacated on other grounds, 522 F. App'x 82, 84 (2d Cir. 2013).

The summary judgment record provides the rationale for defendants' placement of plaintiff Booker in administrative segregation. Although plaintiff Booker has disputed the accuracy of the charges against him, he was placed in administrative segregation after Auburn staff concluded that he distributed a flyer that encouraged an inmate strike and promoted violence against Auburn staff. (Fagan Decl. ¶ 10, 12; Dkt. No. 216-4, at 105). In light of those findings, it was reasonable to conclude that allowing plaintiff Booker to attend congregate services would allow further opportunity to communicate or pass correspondence to other inmates. The prohibition of such attendance was related to security concerns, and thus, clearly served a valid penological

purpose.[11]

Although plaintiff was not permitted to attend congregate religious services, Auburn did provide other religious accommodation in accordance with DOCCS policy. Religious counseling was available upon written request to the facility's ministerial staff. (Graham Decl. ¶ 37). DOCCS rules also allowed plaintiff Booker to keep a Quran and prayer rug in his cell, or similar devotional articles. (*Id.*). Plaintiff Booker has not challenged the legitimacy or the availability of these alternative means of practicing his religion. Therefore, in light of the security concerns that justified a restriction on congregate religious services, and the availability of alternative means of religious exercise that did not infringe on those security concerns, this court recommends that defendants' motion for summary judgment be granted as to plaintiff Booker's First Amendment and RLUIPA claims arising from his confinement in administrative segregation.

## IV. <u>Retaliation Claim</u>

### A. **Legal Standards**

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action"

---

[11] Defendants also argue that plaintiff's history of gang affiliation and prior rules violations provided additional security reasons to restrict his attendance at congregate religious services. (Graham Decl. ¶¶ 38-39). This court need not determine this issue, or address defendants' argument that the general prohibition on congregate services for SHU inmates serves a valid penological objective. (Dkt. No. 201-18, at 12). It is clear that the specific charges that prompted plaintiff Booker's placement in administrative segregation in August 2013 provided a valid penological reason.

taken against him by defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett*, 343 F.3d at 137.

### B.    Application

Plaintiff Booker contends that defendants Graham, Robinson, and Fagan falsified the allegations against him that led to his confinement in administrative segregation in retaliation for his multiple complaints and grievances related to the Ramadan lockdown. (Booker Dep. at 69-71). In particular, plaintiff Booker contends that defendant Fagan falsified his investigation and recommendation of administrative segregation; that defendant Robinson had a retaliatory motive to adopt that recommendation after the administrative hearing; and defendant Graham coordinated this retaliatory scheme and ultimately transferred plaintiff to another facility.[12] (Am.

---

[12] Defendant Graham has argued that, as a supervisory official who merely assigned a hearing officer to evaluate the administrative segregation recommendation, he had no personal involvement in any alleged retaliation. (Dkt. No. 201-18, at 16-17). However, in light of plaintiff's assertion that defendant Graham also transferred him from Auburn in retaliation for grievances, summary judgment is unavailable on this ground. *See Meriwether v. Coughlin*, 879

Compl. at 13-14).

Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n. 21 (S.D.N.Y. 2011) (collecting cases). Confinement in administrative segregation, and the resulting loss of privileges, would certainly constitute "adverse action because it would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill*, 389 F.3d at 381. However, plaintiff must still plausibly allege that there is a causal connection between his grievances and the alleged wrongful conduct. The type of evidence required to establish a causal connection between a plaintiff's protected activity and a defendant's alleged adverse action includes: temporal proximity, prior good discipline, a finding of not guilty at a disciplinary hearing, and statements from the defendants regarding their motives. *Santiago v. Whidden*, No. 3:10-CV-1839, 2012 WL 668996, at *7 (D. Conn. Feb. 9, 2012) (citing *Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007)).

Plaintiff Booker has demonstrated that his confinement in SHU was close in time to his administrative complaints and grievances. Defendant Fagan stated that his August 13, 2013 Administrative Segregation Recommendation was based upon the results of an investigation that began in early August 2013. (Fagan Decl. ¶ 7). Plaintiff Booker has provided evidence of his written complaints regarding the Ramadan lockdown dated July 29, 2013 and July 31, 2013, and an August 2, 2013 grievance

---

F.2d 1037, 1045 (2d Cir. 1989) (officials have broad discretion to transfer inmates, but may not transfer them solely in retaliation for the exercise of their constitutional rights).

raising the same issues. (Dkt. No. 216-4, at 27-28, 77-79). He also filed a separate

grievance on August 8, 2013, alleging that Auburn officials refused to provide all of the

halal food that NOI inmates had purchased for Ramadan. (Dkt. No. 201-5, at 5-6).

Although a "'plaintiff can establish a causal connection that suggests retaliation

by showing that protected activity was close in time to the adverse action[,]' "[s]uch

circumstantial evidence of retaliation, . . . without more, is insufficient to survive

summary judgment." *Roseboro*, 791 F. Supp. 2d at 370 (citations omitted). Moreover,

"[a]s a general matter, it is difficult to establish one defendant's retaliation for

complaints against another defendant." *See, e.g.*, *Hare v. Hayden*, 09 Civ. 3135, 2011

WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011)(citing *Wright v. Goord*, 554 F.3d 255,

274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only

alleged basis for retaliation was complaint about an incident involving another

corrections officer); *Roseboro v. Gillespie*, 791 F. Supp. 2d at 369 (plaintiff has failed

to provide any basis to believe that a corrections counselor would retaliate for a

grievance that she was not personally named in). Relying on this caselaw, defendants

point out that defendant Fagan, who was the primary witness at plaintiff Booker's

administrative hearing, was not named in any of these complaints or grievances, and

had no involvement in the Ramadan lockdown. (Dkt. No. 201-18, at 13). Defendant

Fagan has also specifically denied any knowledge of the relevant grievances at the time

of his investigation. (Fagan Decl. ¶ 10-11).

However, plaintiff Booker has countered defendants' denials of any retaliatory

motive by alleging that defendants Fagan and Robinson each admitted a connection

between his Ramadan grievances and his placement in administrative segregation. Although the court recognizes that plaintiff Booker's recollections may be self-serving, it also notes that his description of these statements has been consistent across his amended complaint, deposition testimony, and his response to this summary judgment motion. (Am. Compl. ¶ 74-76; Booker Dep. at 69-71; Dkt. No. 216-1, at 18.). The summary judgment record also includes a sworn declaration by inmate Mark McCoy, dated March 15, 2016, describing an unidentified hearing officer's admission that Auburn officials were retaliating against those who filed complaints related to Ramadan. (Dkt. No. 216-4, at 87). Faced with this conflict between sworn statements, this court must conclude that a reasonable fact-finder could potentially find plaintiff Booker's allegations of retaliation to be credible.

Even when a plaintiff has shown a causal connection, defendants may still be entitled to summary judgment if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977). Thus, under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir.2002); *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996). Defendants argue that there was sufficient evidence, most of which was confidential, to conclude that plaintiff Booker was involved in organizing a work strike and instructing other inmates to arm themselves and use violence, which justified administrative segregation. (Dkt. No. 201-14, Robinson Decl. ¶ 36).

24

Due to security concerns, defendants have not included the confidential information that implicated plaintiff as part of their motion. (Fagan Decl. ¶ 9; Graham Reply Decl. ¶ 18-19). Defendants' summary of this evidence provides little substantive information. Defendant Fagan stated that his investigation included information from a confidential informant that plaintiff Booker was "not only involved in organizing the work strike, but was the likely leader of the plan." (Fagan Decl. ¶ 13). Defendant Robinson, who presided over the hearing and agreed that plaintiff should be placed in administrative segregation, based his determination on defendant "Fagan's recommendation, his confidential testimony, [and] the confidential letters received which indicated plaintiff was involved in organizing a work strike and instructing other inmates to arm themselves and use violence." (Robinson Decl. ¶ 36).

The only relevant evidence found in the summary judgment record is the text of the flyer that had been distributed to inmates, and the observation of an increase in visits, packages, and commissary purchases at Auburn.[13] (Robinson Decl. ¶ 37; Dkt. No. 216-4, at 105). Even though such evidence may support the defendants' conclusion that a potentially violent inmate strike was being organized at Auburn, it does not resolve the key inquiry of this motion for summary judgment: namely, whether there was a non-retaliatory reason to identify plaintiff Booker as a leader and organizer of the planned work stoppage.

To remedy this gap in the evidence, defendants have offered to provide relevant

---

[13] Defendant Robinson explained that this data is used as an indicator that "the inmate population is aware that an event is going to take place which could cause the facility to be locked down." (Robinson Decl. ¶ 37).

confidential information that supports the administrative determination to the court under seal, for *in camera* review without disclosure to plaintiffs. (Graham Reply Decl. ¶¶ 19-20; Dkt. No. 218). This court has previously requested that defendants provide authority for their position that the court may grant summary judgment based on evidence that is unavailable to the non-moving party.[14] (Dkt. Nos. 203, 209). Defendants have identified only two cases on the issue. (Dkt. No. 217, at 7-19). The first, *Spiteri v. Russo*, Case No. 12-CV-2780 (MKB), 2013 U.S. Dist. LEXIS 5327, at *2-3 (E.D.N.Y. Jan. 14, 2013), permitted the state defendants to file a confidential exhibit in support of their motion to dismiss "under seal on ECF with limited access to the parties in the litigation." Based on the language of the decision, the plaintiff in *Spiteri* already had access to the confidential document, and moved to strike it from the record due to the potential for public disclosure. *Id.*, 2013 U.S. Dist. LEXIS 5327, at *3. Accordingly, it has no bearing on defendant's request in this case.

To her credit, defendants' counsel has also identified *Gibson v. Rosati*, Case No. 9:13-CV-503 (GLS/TWD), 2016 U.S. Dist. LEXIS 66677, at *5, fn.1 (N.D.N.Y. May 19, 2016), adopted, 2016 WL 5390344 (N.D.N.Y. Sept. 27, 2016). In that case, the magistrate judge refused to consider *in camera* evidence offered in support of the defendants' motion for summary judgment that had not been disclosed to the inmate

---

[14] This court notes that this issue is different from prison officials' withholding of confidential information from an inmate during an administrative hearing. That practice has been found to satisfy due process in specific circumstances. *Wolff v. McDonnell*, 418 U.S. 539, 564-65 (1974); *Sira v. Morton*, 380 F.3d 57,74-75 (2d. Cir. 2004). In this case, plaintiff's due process claims were previously dismissed (Dkt. No. 177, at 13-15), and his thirty day confinement in SHU would not ordinarily give rise to a liberty interest implicating due process. *Sandin v. Conner*, 515 U.S. 472, 487 (1995).

plaintiff. *Id.* (citing *Hansberry v. Father Flanagan's Boys' Home*, Case No. CV-03-3006 (CPS), 2004 WL 3152393, at *4 fn. 9 (E.D.N.Y. Nov. 28, 2004) (collecting cases)). After consideration of the limited authority provided, and finding that defendants have not provided any support for their request regarding the filing of confidential information, this court denies defendants' motion for *in camera* review of *ex parte* evidence.

In *Gibson*, the court still recommended granting defendants' motion for summary judgment, based only on evidence that was disclosed to both parties. *Id.* at *17-18. As described above, such evidence is lacking in this summary judgment record. While this court appreciates that legitimate security concerns likely influenced the amount of information offered in support of their motion, I recommend that defendants' motion for summary judgment be denied as to plaintiff Booker's retaliation claim.[15]

## V.    **Motion for Sanctions**

Rule 11 of the Federal Rules of Civil Procedure authorizes sanctions under various circumstances, including where: an attorney has certified groundless and frivolous papers; a document has been presented for an improper purpose, such as to harass or cause unnecessary delay or expense; the claims or defenses are not supported by law; and/or the allegations and other factual contentions lack evidentiary support. Fed. R. Civ. P. 11. The imposition of sanctions is purely discretionary, and that discretion should be exercised only when improper conduct is clear. *Welch v. Selsky*,

---

[15] Because of the outstanding material questions of fact, I also cannot conclude at this time that defendants Graham, Robinson, and Fagan are entitled to qualified immunity.

Case No. 9:06-Cv-812 (LEK/DEP), 2008 WL 238553, at *7 (N.D.N.Y. Jan. 28, 2008).

A test of objective unreasonableness is employed to assess whether conduct is sanctionable; that is, the conduct must be "totally without merit or utterly lacking in support." *Id.* (citation omitted).

Plaintiff Booker's motion for sanctions is premised on his belief that defendants have no factual or legal basis to seek summary judgment. (Dkt. No. 215). This court disagrees. In light of my finding that defendants' motion had merit and the resulting recommendation that summary judgment should be partially granted to defendants, I further recommend that plaintiff Booker's motion for sanctions be denied.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 201) be **GRANTED** as to plaintiffs' First Amendment and RLUIPA claims, and it is further

**RECOMMENDED**, that defendants' motion for summary judgment be **DENIED** as to plaintiff Booker's retaliation claim[16]; and it is further

**RECOMMENDED**, that plaintiff Booker's motion for sanctions (Dkt. No. 215) be **DENIED**, and it is further

**ORDERED**, that defendants' motion to submit documents for *in camera* review under seal (Dkt. No. 218) is **DENIED**.

---

[16] If the district court accepts all of these recommendations, Booker would be the only remaining plaintiff, and Graham, Robinson, and Fagan would be the only remaining defendants in this case.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:      October 26, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge